Kenneth T. LYONS et al.

v.

RHODE ISLAND PUBLIC EMPLOY-
EES COUNCIL 94 et al.

No. 84–118–Appeal.

Supreme Court of Rhode Island.

Oct. 30, 1986.

Joseph A. Kelly, Carroll Kelly & Murphy, John R. Mahoney, Baluch Mahoney Gianfrancesco, Providence, for plaintiffs.

Milton Stanzler, Abedon Michaelson Stanzler & Biener, Providence, for defendants.

OPINION

KELLEHER, Justice.

In this Superior Court action for libel the jury returned a verdict for the defendants. Subsequent to the verdict, the trial justice denied defendants' motion for a directed verdict which was made at the conclusion of the presentation of all the evidence. The decision had been deferred pending the return of the jury's verdict. A second trial justice heard and denied the plaintiffs' motion for a new trial.[1] The plaintiffs now appeal from the various rulings made during the trial and from the denial of their motion for a new trial. The defendants cross-appeal from the denial of their motion for a directed verdict.

This controversy arose out of the alleged dissemination of reprints of a 1972 newspaper article during election campaigns in 1975 and 1976 between two labor organizations vying for the right to represent certain Rhode Island state and municipal em-

1. The first trial justice died before the plaintiffs' motion for a new trial was heard. A successor judge was appointed in accordance with Super. R.Civ.P. 63.

ployees in collective-bargaining matters. The elections took place at the Rhode Island Medical Center on December 29, 1975, the University of Rhode Island (URI) on June 10, 1976, and the city of Newport on September 27, 1976, all of which plaintiffs lost. The plaintiffs are the National Association of Government Employees, Inc. (NAGE), and its President, Kenneth Lyons (Lyons). The defendants are the president and the secretary/treasurer of the American Federation of State, County, and Municipal Employees (AFSCME), an international union; the president and secretary of Council 94, council for the State of Rhode Island Public Employees, affiliated with AFSCME; and the president and secretary/treasurer of local 911, an affiliate of AFSCME representing Newport city employees.

The article at issue, written by Jack Anderson, was originally published as a syndicated column in the New York Post on October 31, 1972, and was entitled "The Investigation." The column discussed federal investigations into activities of plaintiffs Lyons and NAGE that were being conducted by the United States Department of Justice and Department of Labor. After describing Lyons as "[o]ne of President Nixon's favorite labor leaders," the article read in part, "Justice is studying whether he [Lyons] committed perjury in a Mafia-related case, and Labor is investigating charges that he misused union funds."

The column indicated that Lyons's "trouble with the Justice Department" began with Senate testimony about a detergent product "linked to an underworld family with a record for strong-arm business tactics." According to the article, the maker of the detergent had testified before a Senate Committee that when he had come to Boston at Lyons's request to discuss the detergent, one of their companions at lunch and dinner was a nephew of the former "godfather" for western Massachusetts. After the detergent manufacturer appeared before the committee, the article continued, Lyons demanded the opportunity to testify and appeared without a lawyer to deny all the allegations. Because of the contradictions in the Senate record, it was referred to the Justice Department for possible perjury prosecutions. The article also reported that the charges as to misuse of union funds, brought by union dissidents, were also denied by Lyons in a telephone conversation with the reporter.

One of the reprints allegedly distributed by defendants in 1975 and 1976 was an exact photocopy of the Anderson article, with the addition of "New York Post, October 31, 1972" in the top right-hand corner of the page. In the second reprint, the entire article was encircled by a black line, the words "EXPOSE, Jack Anderson looks at NAGE," were printed in bold black letters as a headline across the top, and several phrases were underlined in black. Underscored phrases included: "Kenneth T. Lyons"; "perjury in a Mafia-related case"; "charges that he misused union funds"; "National Assn. of Government Employees"; "is linked to an underworld family with a record for strong-arm business tactics"; "godfather." The words "New York Post—October 31, 1972" were printed above Jack Anderson's byline in print different from that in the article, seemingly having been typed in on the original from which the photocopied reprint had been made. For ease of reference, we shall refer to the exact reprint of the article as the "Anderson reprint" and to the marked reprint as the "EXPOSE reprint." The EXPOSE reprint is reproduced in full in the appendix at the end of this opinion.

The parties stipulated to the fact that the investigations mentioned in the article came to an end in December of 1972 and that no charges were brought against Lyons as a result of those investigations. They also agreed that for the purposes of this action, plaintiffs would be considered public figures. It is not contested that the facts as reported by Jack Anderson were true when his article was originally published in October 1972, although at trial

Lyons initially attempted to deny that he was "investigated."

In their complaint, plaintiffs alleged, inter alia, that defendants "knowingly, falsely and maliciously in reckless disregard of the truth" printed, published, and disseminated the EXPOSE reprint[2] in 1975 and 1976, during the course of each of the union campaigns, to members of the public and to employees of the Medical Center, URI and the city of Newport; that they did so with the intent to convey, and did convey, the impression that plaintiffs "were associated with the Mafia, * * * had committed perjury before a Senate Committee and were linked with an underworld 'family,' and * * * that the plaintiff Lyons had 'misused union funds' "; and that plaintiffs were "still, at the time of the publication, the subject of criminal investigations." The plaintiffs alleged that the statements in the publications were false when made by defendants, Lyons having been "exonerated" of any wrongdoing by the termination of the investigation. They further alleged that defendants, having been notified of the falsity of the publication, failed to investigate the truth of the facts they published and were thus guilty of "reckless disregard" for the truth in publishing the EXPOSE article as they did. As a direct result of defendants' actions, plaintiffs continued, they were caused injury and damage including, but not limited to, loss of membership of and rejection by the public employees of Rhode Island, who prior to the distribution of the article had indicated that they were going to join NAGE.

Conflicting evidence was presented at trial as to which of the reprints had been circulated during which campaigns, as to the awareness of those who acknowledged having circulated either reprint of its alleged "falsity," and as to which defendant was responsible for which distribution.

Warren Olson, a representative of the international union, AFSCME, testified

that he distributed the unaltered Anderson reprint at the Rhode Island Medical Center in September 1975 and that he had no idea that the article was false in any way. His testimony was contradicted by that of Harry Breen, national vice president of NAGE, who testified that he had observed Warren Olson and John Breen, another employee of AMFSCE, distributing the EXPOSE article at the Medical Center approximately eight or nine days before the December 1975 election. He stated that when he asked them why they were distributing it when they knew it to be a lie, they responded, "We know it's a lie but the employees do not know it's a lie."

John Breen (no relation to Harry) testified that from October through December of 1975 he assisted in the campaign against NAGE at the Medical Center. He denied ever having seen either of the reprints during that period or having talked about either of them with Warren Olson or with Harry Breen. He acknowledged having seen the Anderson reprint when employed by NAGE in 1972 and knowing at that time that the investigations had been concluded.

There was also conflicting testimony as to the alleged distribution at URI of either of the reprints prior to the election there in June of 1976. Harry Breen again testified that he had seen Olson and John Breen distributing the EXPOSE article, and Olson and Breen denied it. Robert DiRamio testified that he had worked in the New England area during 1975 and 1976, that he had been at URI off and on during April and May of 1976 prior to the election there, that he had not seen a leaflet containing the Anderson article, and that Harry Breen, to his knowledge, was not at the university at any time.

In regard to the Newport election, J. Howard Duffy, staff representative for AFSCME council 70, who serviced local 911 in Newport, testified that he drafted and authorized the mailing of a letter, dated

---

**2.** Although plaintiffs' complaint alleged libel only as to the EXPOSE reprint, the trial justice, prior to closing arguments, allowed an amend-ment to include the unaltered Anderson reprint as well.

September 15, 1976, on AFSCME council 70 stationery, to the members of local 911, attached to which there was an EXPOSE reprint. At the end of the cover letter, which discussed the virtues of AFSCME as opposed to NAGE representation, were the words "Be sure and read the Jack Anderson pamphlet." Duffy testified that he had received the EXPOSE reprint from Warren Olson, who acknowledged only that he had provided Duffy with the Anderson reprint for informational purposes. Duffy testified that he had relied upon the reputation of Jack Anderson, and did not know, nor did he attempt to verify, whether an investigation was going on at the time he authorized the mailing of the EXPOSE article.

AFSCME acknowledged having received a letter in March of 1976, prior to the URI and Newport elections, sent by attorneys representing NAGE in other litigation involving Lyons in the U.S. District Court in the District of Columbia, to Jerry Wurf, president of AFSCME. The letter, as admitted into evidence,[3] informed Wurf that the republication of the article constituted the basis of a libel action because the investigations referred to in the Anderson article were concluded favorably to NAGE and Lyons in December of 1972. The letter suggested that AFSCME terminate distribution of the article because of its "falsity" and its defamatory nature.

AFSCME also acknowledged the receipt of a letter sent by an attorney for NAGE on May 21, 1976, to the general counsel of AFSCME, advising him that the EXPOSE article had been distributed or posted on bulletin boards in Newport on May 18, 1976, by agents of AFSCME. Both letters were admitted only as evidence of notice to

defendants of plaintiffs' claims and not for the truth of their contents.

At the end of all the evidence, defendants moved for a directed verdict, on which the trial justice reserved judgment. He instructed the jury and provided them with special interrogatories that sought a breakdown as to whether either plaintiff, Lyons or NAGE, was libeled by any of the three defendants. No breakdown was sought as to which of the elements of libel were or were not found in each instance. The jury found no libel by any of the defendants as to either plaintiff.

After the verdict, the trial justice denied defendants' motion for a directed verdict as to both claims. The plaintiffs brought a motion for a new trial on the grounds that the verdict was contrary to the law and the weight of the evidence, which motion was denied. The plaintiffs now claim error in the denial of that motion, in the instructions given the jury, and in the exclusion of certain evidence.

Before addressing plaintiffs' claims, a brief overview of the elements of an action in defamation is in order. It is well settled, although we have not specifically so held at one time, that such an action requires proof of "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher"; and (d) damages, unless the statement is actionable irrespective of special harm. Restatement (Second) Torts § 558 (1977). As to the first element, principally at issue in this appeal, Rhode Island law incorporates the concept of falsity into its definition of a defamatory statement.[4] According to our cases,

3. As originally received by Wurf, the letter noted that it was the opinion of the chief judge in the District of Columbia litigation that the republication of the article constituted actionable libel; the text of the opinion was attached to the letter. The plaintiffs' attempt to have the entire document admitted into evidence was thwarted by the trial justice, who ruled that its admission even as evidence of the state of mind of the defendants would be prejudicial to the defend-

ant. The trial justice allowed the admission of the letter only, with all reference to the District Court decision deleted.

4. This factor sometimes leads to confusion, the word "defamatory" at times being used to include the element of falsity and at times only to refer to the particular type of language—i.e., injurious to reputation, and so forth. The fact that "defamation" is also the name of the tort

" '[a]ny words, if false and malicious, imputing conduct which injuriously affects a man's reputation, or which tends to degrade him in society or bring him into public hatred and contempt are in their nature *defamatory.*' " *Elias v. Youngken*, 493 A.2d 158, 161 (R.I.1985). Libel consists of such a statement " 'expressed in printing or writing, or by signs, pictures, [etc]. . . .' " *Henry v. Cherry & Webb*, 30 R.I. 13, 18, 73 A. 97, 99 (1909). If the plaintiff is a public official or public figure, it is constitutionally required that he prove by clear and convincing evidence that the communication was published with "actual malice"—that the publisher knew of its falsity or acted in reckless disregard of whether it was false. *New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706 (1964); *De-Carvalho v. daSilva*, 414 A.2d 806, 812 (R.I.1980). Although truth is an absolute defense to a charge of libel, *Perry v. Man*, 1 R.I. 263, 265 (1849), the burden of proof of falsity is upon the public-figure plaintiff. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. ——, ——, 106 S.Ct. 1558, 1563, 89 L.Ed.2d 783, 792 (1986).

▮ Words alleged to be defamatory must be read in the context of the publication in which they appear, taken as a whole. *Bray v. Providence Journal Co.*, 101 R.I. 111, 116–17, 220 A.2d 531, 534–35 (1966). The suspect verbiage is to be construed in its "plain and ordinary sense * * * presumed to have [been used] in their ordinary import in the community in which they are uttered or published." *J.A. & R.A. Reid v. Providence Journal Co.*, 20 R.I. 120, 122, 37 A. 637 (1897). However, words cannot be isolated from the circumstances in which they are uttered. *See Della Posta v. Rand Express Freight Lines, Inc.*, 86 R.I. 148, 133 A.2d 775 (1957). "[T]he decisive question is what the person * * * to whom the communication was published reasonably understood as the meaning intended to be expressed." Restatement (Second) *Torts* § 563(e) (1977).

▮ Although plaintiffs have charged the trial justice with committing several errors during the course of the trial, in our opinion the decisive issue in this dispute is the denial of plaintiffs' motion for a new trial by the Superior Court justice who considered the new-trial motion.

In their new-trial motion plaintiffs alleged that the jury's verdict was against the weight of the evidence. As noted earlier in this opinion, the trial justice died after the new-trial motion was filed but before he could give any consideration to the motion's merits. Subsequent to the trial justice's death, the presiding justice of the Superior Court, acting pursuant to the terms of Rule 63 of the court's Rules of Civil Procedure, appointed another member of the court to act as a successor justice.

In its pertinent portions, Rule 63 provides that whenever a trial justice, because of death, illness, or other disability, is unable to perform the duties of the office after a jury verdict has been returned, the presiding justice can designate a successor justice who may consider and determine the motion. However, if the successor is of the belief that s/he cannot resolve the motion because the successor was absent from the trial or for any other reason, the successor "may make such order as the circumstances may require."

Here, the successor justice was completely conversant with the court's holding in *Ruggieri v. Beauregard*, 110 R.I. 197, 291 A.2d 413 (1972), where a successor justice, after considering a motion for a new trial that had alleged that the jury's award for pain and suffering was inadequate because it was against the weight of the evidence, granted the motion and awarded the plaintiff an additional $3,400. In vacating that award, this court emphasized that in this jurisdiction a Superior Court justice, when considering a new-trial motion challenging the sufficiency of the evidence, becomes a "super-juror" who is required to make an independent evaluation of the evidence, in-

serves only to add to the confusion that, as will    be seen, runs throughout this controversy.

cluding such matters as assessing the credibility of the witnesses and determining the weight of the evidence. The court in *Ruggieri* also stressed that as a general rule credibility cannot be assessed by one who has neither seen nor heard the witnesses. Thus, the grant of the additur was set aside as an "abuse of discretion" and the case remanded to the Superior Court for a new trial.

Here, the successor justice acknowledged his inability to make any assessment of credibility but proceeded to deny plaintiffs' motion by taking an approach that is innovative and imaginative but falls far short of satisfying the controlling principles set forth in *Ruggieri.* In rejecting plaintiffs' new-trial motion, the successor justice found issues of credibility only as to the questions of publication and malice and assumed that plaintiffs had sustained their burdens in those two areas. He also assumed that the EXPOSE article, if false, was defamatory, observing, "To state that someone is under investigation by the U.S. Labor Department for misuse of funds, if false, is defamatory." However, he then determined that there was no question of credibility on the "vital issue upon which this case turns * * * the truth or falsity * * * of the EXPOSE article." The successor justice reasoned that since no evidence had been presented to indicate that Lyons had not been under investigation in October 1972, the article was literally true when printed. He admitted that plaintiffs' argument that the article became untrue or false when circulated in 1975 and 1976 would have "carried the day had the publication not contained the date October 31, 1972." "No reasonable minds," declared the successor justice, "who read the article in 1975 or 1976 would conclude that the article spoke of that time and that there were pending investigations." In the successor justice's opinion, the insertion of the October 1972 date within the reprints circulated in 1975 and 1976 "prevents any jury from concluding that the article was false."

In further explaining his rationale for the approach taken in rejecting plaintiffs' new-trial motion, the successor justice alluded to the so-called appellate rule that this court invokes whenever a trial justice fails to discharge his or her obligation when considering a motion for a new trial following a jury verdict. In *Belanger v. Cross,* 488 A.2d 410 (R.I.1985), we again emphasized, as we have in numerous cases, that in situations in which the trial justice has failed to discharge his duties in the consideration of a new-trial motion, this court will apply the appellate rule and examine the evidence in the light most favorable to the prevailing party to determine if there is any competent evidence that, if believed, would support the jury's verdict. If there is, the motion for a new trial will be denied. The trial justice wondered aloud, "[I]f the Supreme Court can use the appellate rule in these circumstances, why can't the hearing judge in these circumstances use the appellate rule?"

The response to this inquiry is, of course, that the appellate rule comes into play only after a trial justice has considered a new trial motion and has afforded the opportunity to assess the witnesses' credibility and determine the weight of the evidence. This court believes that an essential part of the Superior Court jury trial process is an evaluation of a motion for a new trial by the justice who presided at trial. Nevertheless, when there has been a misconception of material evidence in the consideration of that new-trial motion, this court is no longer required to give to the trial justice's consideration that deference given when the consideration of the motion is flawless.

In this controversy no one disputes that credibility of the witnesses was in issue. In essence, plaintiffs have charged defendants with publishing what might be called a "half truth." There is no question that in 1972 Anderson was right on target when he reported that Lyons was the subject of an ongoing Justice Department and Labor Department investigation. The article was peppered with numerous provocative references to whether Lyons had committed per-

jury in a Mafia-related case or misused union funds. The detergent is described as being linked to an underworld family with a record for strong-arm business tactics. One of Lyons's dining companions was identified as a nephew of a deceased "mob godfather" for western Massachusetts.

Here, everyone concedes that the investigations were not in progress when the articles were being distributed in the organizational war going on in 1975 or 1976. Again, Anderson's article was embellished in the so-called EXPOSE publication when some unknown individual undertook the task of underlining the phrases to which we have just referred. Two thousand copies of the Anderson article were printed for distribution during the Medical Center campaign. Close to two hundred copies were also prepared for the Newport confrontation.

The successor justice's unquestioned belief that no reasonable person would be deceived by the republication of the Anderson article is somewhat at odds with the evidence presented at trial by NAGE's national vice president, who testified that two employees of the national union who were distributing the EXPOSE article at the Medical Center allegedly said, in response to the vice president's query, "We know it's a lie, but the employees do not know it's a lie."

Again, it should be noted that after the jury had returned its verdict, the trial justice, who had reserved decision on defendants' motion for directed verdicts, in denying the motion, observed:

"I feel that the jury could have found that the distribution of Exhibit No. 1 [the Medical Center distribution] so many years after [publication] * * * [renders it] conceivable that the jury could have found that there was knowledge of the termination of the investigations, and that the dissemination of the information in 1975 or 1976 did misinform * * * or could have misinformed the ordinary reader who might have felt at that point that the article indicated that the investigation was still continuing."

Thus, although we commend the successor justice for his attempt to resolve a most difficult situation, we see no reason to depart from what was emphasized and stressed in the *Ruggieri* case. A new trial is mandated.

We are concerned that the trial justice in his charge to the jury consistently referred to "articles published by the defendants." However, to be exact, there was but one publication of the Anderson article, and that occurred in 1972. The defendants' efforts in circulating Anderson's article should be more properly described as republications of the article. Recently, in *Martin v. Wilson Publishing Co.*, 497 A.2d 322, 330 (R.I.1985), we refused to countenance the republication of false or baseless rumors by the media. Concededly, here we are dealing with the republication of an article that was accurate on the day of publication but somewhat less than accurate at the time of its republication. Thus, we think it incumbent that on retrial the jury be instructed that in determining whether the republications in this case were false and defamatory, the decisive question is what the persons to whom they were disseminated in 1975 and 1976 reasonably understood as the meaning intended to be expressed by the disseminators.

As noted earlier, the defendants have filed a cross-appeal in which they challenge the denial of their motion for directed verdicts. Their contention merits little discussion for the record does contain competent evidence which would warrant the jury in returning verdicts and award of monetary damages for each plaintiff against each defendant.

The plaintiffs' appeal is sustained, and the judgment appealed from is vacated. The defendants' appeal from the denial of their motion for a directed verdict is denied and dismissed.

BEVILACQUA, C.J., participated in the oral argument and in the decision of the court but retired prior to the publication of this opinion.

APPENDIX

# EXPOSE

## Jack Anderson looks at NAGE

New York Post – Oct. 31, 1972

### Jack Anderson

**THE INVESTIGATION**

WASHINGTON.

One of President Nixon's favorite labor leaders, who has been inducted into the Republican holy of holies, is under double-barreled federal investigation.

Both the Justice and Labor Depts. are looking into the doings of Kenneth T. Lyons, a tough and talkative union boss now serving as national vice-chairman of Democrats for Nixon. Justice is studying whether he committed perjury in a Mafia-related case, and Labor is investigating charges that he misused union funds.

Lyons heads not only the 100,000-strong Nat'l. Assn. of Government Employes but, embarrassingly for him in the present circumstances, the 30,-000-member Intl. Brotherhood of Police Officers.

\*       \*       \*

But while government gumshoes have been checking on Lyons, President Nixon has been courting him. The President has appointed him to the prestigious White House higher education advisory council and has invited him to at least two White House affairs.

As an officer of Democrats for Nixon, Lyons also attended the exclusive Texas barbecue which ex-Treasury Secretary Connally threw for Nixon. But Lyons' entree to the councils of the mighty hasn't deterred the federal sleuths.

His trouble with the Justice Dept. began last June with Senate testimony about a detergent called Poly-Clean. The product, according to the Senate testimony, is linked to an underworld

family with a record for strong-arm business tactics.

The detergent's maker, David Weiner of Palmer, Mass., was called on the witness stand. His testimony and vouchers he produced showed that, at Lyons' request, he made four trips to Boston to discuss Poly-Clean.

One of their lunch and dinner companions, the vouchers show, was Tony Camerota. He is a nephew of the late Nick Camerota, who was the mob "godfather" for western Massachusetts until his recent demise.

Finally, the vouchers tell of an agreement between Weiner and Lyons for distributing Poly-Clean through a company called "Noreast Sales Corporation." Talks about the deal lasted for hours, the vouchers attest.

After Weiner's damning statements, Lyons demanded to testify before the committee. He appeared without a lawyer to deny all the allegations. He swore he didn't know Camerota, had never heard of Noreast Sales Corp. and couldn't recall Weiner's "ever buying me a cup of coffee."

Lyons also testified that he had met with Weiner twice, not four times, that Weiner had tried to get him to push Poly-Clean, but that he had rejected the deal.

The Senate record was so shot with contradictions that it was referred to the Justice Dept. for possible perjury prosecutions. Within the last few days, the Senate has also sent Justice an article from the Boston Globe identifying two new prospective witnesses in the case.

As for the probe into Lyons's alleged

misuse of union funds, the charges were brought by union dissidents. The Labor Dept. will confirm only that the investigation deals with "financial affairs."

We reached Lyons in Boston for his comments. He talked at length without notes, repeating the same detailed denial he had given under oath to the Senators. "The thing is so unreal," he said of the Poly-Clean case. "It comes as a complete mystery to me." On the alleged misuse of funds, he was "confident" he would be cleared.

Weiner, in an earlier talk with my associate Les Whitten, said he ran a clean company with no Mafia ties. He also stuck to his Senate testimony. It may take the courts to resolve the conflicting stories.

\*       \*       \*

A number of Democratic hopefuls, anticipating George McGovern's defeat next week, are already jockeying for positions in the 1976 Presidential sweepstakes.

They include three of the Senate's most able and articulate memoers—Indiana's Birch Bayh, Idaho's Frank Church and Minnesota's Walter Mondale. All three have told friends, however, that they'll step aside if Sen. Kennedy seeks the nomination.

McGovern is also expected to make a second bid if he isn't too badly mauled by the voters on Nov. 7. But he might have trouble simply keeping his Senate seat, since he must come up for re-election in 1974 in conservative South Dakota.

McGovern's two vice presidential choices, Tom Eagleton and Sargent Shriver, are also making presidential noises in private. But Eagleton wouldn't likely challenge Kennedy and certainly Shriver will give his eminent brother-in-law first crack at the nomination.

The big question mark is whether Kennedy will run. He has told intimates that he's definitely interested but hasn't made up his mind.

