**Fortunato TAVARES**

v.

**Jacob W. STONE, M.D.**

**No. 84–364–Appeal.**

Supreme Court of Rhode Island.

April 6, 1987.

John F. McBurney, Pawtucket, for plaintiff.

Bruce G. Tucker, Roberts, Carroll, Feldstine & Tucker, Providence, for defendants.

OPINION

FAY, Chief Justice.

This is a medical-malpractice action [1] that comes to us on the defendant's appeal from the denial of his motion for a directed verdict and the denial of his motion for a new trial. The directed-verdict motion was heard and denied by the trial justice who presided at trial. A successor justice heard and denied the defendant's motion for a new trial. [2] We affirm in part and reverse in part.

The plaintiff asserts that defendant committed malpractice by negligently failing to treat or refer plaintiff to another physician for treatment and that defendant's inaction proximately caused plaintiff's leg to be amputated. The following evidence was revealed at trial.

The plaintiff, Fortunato Tavares (Tavares), [3] at the time of his work-related injury, was an employee of the Commercial Braid Company in the city of Pawtucket. On April 13, 1978, Tavares dropped a sixty-pound can of elastic braid on his right foot. The following day Arthur Viveiros, the foreman who routinely accompanied non-English-speaking employees seeking medical assistance, brought Tavares to the Miriam Hospital. Tavares's right leg and ankle were examined and x-rayed, and his injury was diagnosed as a contusion. He was instructed to apply ice to the lower leg and foot areas and to elevate the foot. He was also told that he could return to work, which he did for a few weeks.

On May 4, 1978, Viveiros brought Tavares, who was still suffering from pain and discomfort and who was now unable to work, to see defendant, Dr. Jacob Stone. From this point on, the testimony and other evidence at trial became conflicting. Tavares testified that his leg was very swollen and had begun to blacken in color on the day he visited Dr. Stone. According to Tavares, the examination conducted by Dr. Stone occurred in the corridor outside the physician's office and consisted of Tavares's hiking up his pant leg and Dr. Stone's examining the leg and foot from a distance of two to three feet. Doctor Stone did not touch or probe the affected area, nor did he ask Tavares to remove the shoe and sock from the right foot. Tavares also indicated that Dr. Stone did not refer him to any other doctor.

In contrast, Dr. Stone testified that he examined Tavares in his examination room and that Tavares did not have his shoe and sock on during the examination. Doctor Stone explained that the leg and foot were red and swollen and that he felt for pulses in the affected area, performed a Homan's test, [4] and diagnosed Tavares's condition as

---

1. Suit was originally filed by plaintiff against defendants Dr. Stone, Dr. G. W. Banks, the Pawtucket Memorial Hospital, and the Miriam Hospital. Summary judgment was entered for Miriam Hospital on February 1, 1979. A medical-liability mediation panel concluded in 1981 that plaintiff's complaint presented no legitimate question of liability against the remaining three defendants. The plaintiff appealed the findings of the panel to the Superior Court, and stipulations were entered into in 1983 dismissing plaintiff's claims against all but Dr. Stone.

2. Although the trial justice who presided over the trial heard arguments on defendant's motion for a new trial, he died prior to rendering a decision. A successor justice was appointed in accordance with Super.R.Civ.P. 63.

3. The plaintiff did not speak English; he testified at trial through an interpreter.

4. The Homan's test or sign "is elicited by forcing the foot into a position of dorsiflexion, which causes pain in the calf muscles and in the popliteal space. The popliteal space is the hollow behind the knee. By dorsiflexion is meant the movement of the foot at the ankle joint in such a direction that the toes will be brought closer to the front of the shin. Put in other words, it is the movement of the foot which makes the angle between the upper surface of the foot and the shin smaller." 2 Schmidt, Attorney's Dictionary of Medicine, H–82 (1982). The test is designed as a means to detect the existence of thrombosis, which is the formation of clots on the inner surface of the veins. *Id.* at H–81.

arteriosclerosis [5] of the vessels of the lower right leg. Doctor Stone said he related his findings to Tavares via Viveiros, the foreman-interpreter, and referred Tavares to Dr. Norbert Fleisig, a vascular surgeon, for an opinion and conclusion on his condition. Doctor Stone then wrote out Dr. Fleisig's name, address, and phone number on a prescription pad and handed the sheet to Viveiros, who in turn gave it to Tavares. Viveiros's testimony corroborated Dr. Stone's.

Because of his continuing complaints of pain in the right foot and swelling of that leg and foot, Tavares's wife took him to the Pawtucket Memorial Hospital emergency room three days later. Tavares was examined there by Dr. G. W. Banks. The hospital report of this visit indicates that Tavares was treated with medication, told to stay off the right leg, and referred to another physician for a follow-up examination.

Tavares next sought medical assistance on May 11, 1978 from Dr. Schiff, a podiatrist. Doctor Schiff in turn referred Tavares to Dr. John Yashar. Tavares saw Dr. Yashar that same day and was diagnosed as having thrombophlebitis [6] and arterial insufficiency of the lower right leg. Doctor Yashar admitted Tavares to Pawtucket Memorial Hospital where he remained for close to a month. During Tavares's stay, Dr. Yashar conducted an arteriogram [7] of the lower leg and discovered considerable blockage in the arteries below the right knee. He attempted to improve the arterial circulation to the lower leg by performing a bypass graft, but this procedure was unsuccessful. Ultimately Dr. Yashar was forced to amputate Tavares's right leg below the knee after the area became gangrenous.

■ In his appeal Dr. Stone argues that the testimony of both Tavares and his expert medical witness, Dr. Jose daSilva, taken in light of all the other evidence, was "inherently improbable" under the principles set forth in *Economou v. Valley Gas Co.*, 112 R.I. 514, 312 A.2d 581 (1973), and should have been disregarded by the trial justice. Accordingly, Dr. Stone contends, the trial justice should have granted his motion for a directed verdict. We find Dr. Stone's position to merit little discussion, for in our opinion the record contains competent evidence that would warrant the jury's returning a verdict and award for Tavares. Therefore, we affirm the trial justice's denial of the directed verdict.

■ Doctor Stone also maintains that Super.R.Civ.P. 63,[8] as construed by this court in *Ruggieri v. Beauregard*, 110 R.I. 197, 291 A.2d 413 (1972), requires a successor trial justice to grant a motion for a new trial if credibility issues arose at trial. Since this trial contained credibility issues regarding material evidence, Dr. Stone contends, the successor justice abused his discretion in denying his motion for a new trial pro forma. We agree.

In *Ruggieri* we stated that

"if the record discloses no basis for believing that a problem of credibility exists, [the successor justice] may well be able to rule upon the motion upon examining the transcript of testimony. * * * However, if the judge designated to consider the motion [for a new trial] does find that the record presents issues as to

---

5. Arteriosclerosis is defined as "[a] condition of the arteries characterized by a hardening and thickening of their walls, accompanied by a loss of elasticity." 1 Schmidt at A–296.

6. Thrombophlebitis is defined as a clot in the venous system with accompanying inflammation. Steadman's Medical Dictionary, 1449 (5th Lawyers ed. 1982).

7. An arteriogram is "[a]n x-ray picture of an artery, especially one taken after the injection of an opaque substance—opaque to x-rays—into the blood." 1 Schmidt at A–295.

8. Rule 63 provides:

"If by reason of death, sickness, or other disability, a judge before whom an action has been tried is unable to perform the duties to be performed by the court under these rules after a verdict is returned or findings of fact and conclusions of law are filed, then, by order of the Presiding Justice, any other justice may perform those duties; but if such other justice is satisfied that he cannot perform those duties because he did not preside at the trial or for any other reason, he may make such order as the circumstances may require."

credibility * * * a new trial should be ordered." *Ruggieri*, 110 R.I. at 199–200, 291 A.2d at 414 (quoting 1 Kent, *R.I. Civ. Prac.* § 63.1 (1969)).

*See also Lyons v. Rhode Island Public Employees Council 94*, 516 A.2d 1339 (R.I. 1986), wherein we recently affirmed our decision in *Ruggieri*.

The case before us is replete with credibility issues on material facts. As we indicated earlier, Tavares's testimony concerning Dr. Stone's examination of him on May 4, 1978 was contradicted in toto by Dr. Stone, Mr. Viveiros, and the relevant medical exhibits. In addition, Dr. daSilva's testimony was similarly contradicted by both Dr. Stone and Dr. Yashar on issues of causation. Doctor daSilva opined that thrombophlebitis resulted in the need to amputate Tavares's leg and that the leg could have been saved but for Dr. Stone's failure to follow the proper standard of care that included immediate hospitalization and the administering of anticoagulants and antibiotics. Doctors Stone and Yashar opined that amputation was due to an arteriosclerotic condition in the leg that worsened only after Tavares was admitted to Pawtucket Memorial Hospital.

For the above-stated reasons, the defendant's appeal is sustained in part and denied in part and the case is remanded to the Superior Court for a new trial.