**Richard J. PEARCE**

v.

**INTERNATIONAL DISPLAY CORP.**

No. 85–130–Appeal.

Supreme Court of Rhode Island.

June 3, 1987.

---

Dennis Ganno, Ralph Della Rosa, Law offices of Kevin M. Cain, John P. McGann, Coffey, McGovern, Noel & Neal, Ltd., Providence, for plaintiff.

James Solan 3rd, Christine J. Engustian, Gardner, Sawyer, Gates & Sloan, Providence, for defendant.

## OPINION

SHEA, Justice.

This breach-of-employment-contract action comes before us following a Superior Court jury trial and the grant of the defendant's motion for a new trial. We affirm.

The essential facts of this case are in dispute. The plaintiff, Richard J. Pearce (plaintiff), filed a complaint against defendant, International Display Corporation (International), alleging that on February 1, 1976, plaintiff and an officer of International agreed in writing that plaintiff would serve as vice president of defendant for a term of two years at a salary of $41,600 for the first year and $44,200 for the second year. The plaintiff claims that subsequently he was wrongfully discharged by International on August 20, 1976. The defendant's answer stated that plaintiff actually had resigned from his job. International counterclaimed that plaintiff refused to make good on a loan of $3,575 that International claims to have made to plaintiff during his employment with International.

At trial plaintiff testified that he worked for International from 1965 until his alleged firing in 1976 and served as a vice president there from 1971 to 1976. He stated that he had an excellent business relationship with John D. Kilmartin, International's president, and that he had no warning that his job was in jeopardy. He had been out sick for several days in August 1976 when Kilmartin called plaintiff at home and asked to see him. The plaintiff recalled the substance of the meeting at which only he and Kilmartin were present:

> "I came in. He took me into an office down in the back and he said that he had something to say to me. And I said, 'Yes, what is it?' And he said 'I'm very unhappy. You have lost interest in your job, in this company, and I am sorry but we are going to have to let you go.' I told him I wasn't feeling good and I'm sure that I would get over it, if that's the way he felt. But he said, 'No, we have decided to let you go.' That was it."

After this brief exchange, Kilmartin gave plaintiff an envelope containing two weeks' pay, which plaintiff opened when he arrived home.

On cross-examination, plaintiff stated that his wife had recently returned home in early August 1976 after being hospitalized for serious heart problems. He implied that his sickness during this period stemmed from his wife's illness. He also said that Kilmartin called him sometime after his dismissal from International, claiming that plaintiff owed International $3,500 and must repay it. The plaintiff explained that this money, which he had used to buy a truck, represented an advance on his bonus for that year and for that reason he refused to return the money.

Kilmartin was called by plaintiff as an adverse witness. He admitted entering into a two-year employment contract with plaintiff in February 1976. He confirmed that in an August 1976 interrogatory he stated that plaintiff appeared to be uninterested in the business and had been absent on many occasions to the detriment of the company. Nevertheless, Kilmartin maintained at trial that plaintiff had been an excellent worker with whom he never had any problems.

Kilmartin offered a markedly different version of plaintiff's departure. In late

August 1976 plaintiff told Kilmartin in the course of a business meeting that he wished to resign. Kilmartin then directed Rita Cooney, the personnel director, to type out a letter of resignation. He recalled the brief, private meeting with plaintiff:

"A. * * * We had been talking. I said, you know, 'Are you sure you want to do this?' He said, 'Yeah, I've been thinking it over and I just want to leave.' * * * I was disappointed but I suppose in the back of my mind I felt that he probably was either going to work for a competitor, a better job with better pay, or go in business himself.

"Q. You didn't know that was the case?

"A. No. I had no idea. It was a very friendly parting. I gave him a couple of weeks' pay. We shook hands. He signed a letter of resignation and we parted friends."

Following plaintiff's departure, Kilmartin placed the letter of resignation in a small safe in his office; it subsequently disappeared after the safe was stolen during a break-in in November 1976.[1] With respect to the counterclaim, Kilmartin stated that plaintiff had already received his bonus for the year before obtaining the alleged loan. Kilmartin explained that the loan money was written off as a bad debt on the corporate records after plaintiff refused to pay it back.

Following Kilmartin's testimony, defendant moved for a directed verdict, asserting that plaintiff did not meet his burden of proving the existence of an employment contract. The trial justice denied the motion, stating that there was evidence of a partly oral, partly written contract.

International then presented its first witness, Constance Roberts, who had been plaintiff's secretary when he worked for International and then had worked as his secretary at another company late in 1976. She recalled that before he left International plaintiff told her that if he was making this kind of money for Kilmartin, he might as well make it for himself. Roberts also testified that plaintiff once informed her that Kilmartin had fired him. However he later told her that he had quit because he would never have given Kilmartin the pleasure of firing him. On cross-examination Roberts testified that she left plaintiff's company after she received a telephone call from a company employee firing her, an act for which she believed plaintiff was partially responsible.

Another defense witness, Rita Cooney, testified that she was in charge of personnel records at International in 1976. She corroborated Kilmartin's testimony concerning the letter of resignation, stating that in late August 1976 Kilmartin asked her to type a letter of resignation for plaintiff. However, she did not witness plaintiff's signature. She identified company records showing that plaintiff was absent from work on July 29, 1976, and for thirteen days in August 1976.

At the close of the evidence International again moved unsuccessfully for a directed verdict. The trial justice then charged the jury, inter alia, that as a matter of law, a two-year employment contract existed between International and plaintiff under which the latter could be terminated only for gross negligence or misconduct. He also stated that in order for plaintiff to recover in this case, plaintiff must prove, by a preponderance of the evidence, that (1) he was wrongfully terminated by International and (2) he was ready, willing and able to work at the time of termination. The jury returned a verdict for plaintiff on his claim against International in the amount of $45,000. The jury also returned a verdict for International on its counterclaim against plaintiff in the amount of $3,575. International subsequently filed a motion for a new trial, which was heard and granted on November 28, 1984. The trial justice reviewed the evidence and concluded that plaintiff voluntarily resigned after being fired by Kilmartin. Conse-

---

1. International submitted into evidence a police complaint concerning a breaking and entering at International in which a safe, among other things, was reported stolen.

quently, he decreed both judgments to be vacated and ordered a new trial.[2]

On appeal plaintiff argues that the trial justice improperly inferred that Kilmartin had fired him and later had reached a gentleman's agreement whereby plaintiff resigned voluntarily. The plaintiff asserts that this inference is not based on any competent evidence in the record. The plaintiff further contends that this inference amounts to the drawing of an inference upon an inference. Alternatively, plaintiff argues that the trial justice's conclusion—that plaintiff voluntarily resigned after being fired by Kilmartin—is based on a misconception of the evidence and is clearly wrong.

As this court has said on many occasions and reiterated recently in *Gardiner v. Schobel*, 521 A.2d 1011 (R.I. 1987), on a motion for a new trial the trial justice must

"assume the role of a seventh or superjuror and * * * consider, in the exercise of his independent judgment, all of the material evidence in the case in the light of his charge to the jury and * * * pass on its weight and the credibility of witnesses. The trial justice should allow the verdict to stand if the evidence is evenly balanced or is such that different minds could fairly come to different conclusions. Alternatively the verdict should be set aside when, in the court's judgment, it is clearly wrong because it fails to respond truly to the merits of the controversy and to administer substantial justice and is against the fair weight of the evidence." *Id.* at 1015 (citing *Barbato v. Epstein*, 97 R.I. 191, 193–94, 196 A.2d 836, 837 (1964)).

In the decision the trial justice must set forth with some specificity the evidence he or she relies on to enable this court to review decisions adequately. *Sarkisian v. The New Paper, Inc.*, 512 A.2d 831, 836 (R.I. 1986). If the trial justice performs

these duties correctly, his or her ruling will be afforded great weight and will not be disturbed unless the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong. *Borowski v. Gelco I.V.M. Leasing Co.*, 121 R.I. 296, 298, 397 A.2d 1315, 1317 (1979). If, however, the trial justice fails to discharge his or her obligation when considering a new-trial motion, this court will apply the appellate rule, in which case the evidence is examined in the light most favorable to the prevailing party to determine if there is any competent evidence that, if believed, would support the jury's verdict. *Lyons v. Rhode Island Public Employees Council 94*, 516 A.2d 1339, 1344 (R.I. 1986).

We have examined the decision of the trial justice on the new-trial motion and conclude that he carefully followed the duties required of him. The trial justice first stated in his decision that much of the testimony of both plaintiff and defendant was incredible. His statement that he "knew what really happened" was not mere speculation but was based on the testimony of plaintiff, Kilmartin, and the corroborating testimony of other witnesses. He explained his conclusions as follows: plaintiff was distraught over his wife's illness and was showing very little interest in his work at the time but was coming into work for very short periods "just to keep his hands in." At their meeting Kilmartin suggested to plaintiff that he resign and, if he did so, he would get some severance pay. The plaintiff then resigned and received two weeks' pay.

The trial justice further explained that he believed Kilmartin's testimony regarding the loss of the letter of resignation during the break-in. He believed Rita Cooney when she stated that she typed out a resignation letter. The trial justice also found the following testimony of Constance Roberts to be both credible and particularly revealing in spite of her testimony on

---

**2.** It appears that the jury verdict for International on its counterclaim against plaintiff could have been preserved at the discretion of the trial court because of the distinct nature of the claim. However, because International did not raise this issue and because such matters are committed to the discretion of the trial justice, we do not reach this issue. *See Kelly v. C.H. Sprague & Sons Co.*, 455 A.2d 1302, 1306 (R.I. 1983)(trial justice has discretion to limit a new trial to specific issues).

cross-examination that revealed a possible bias:

"Q. And did Mr. Pearce on or about the same time have a conversation with you concerning whether he quit or was fired from International Display?

"A. Yes, sir. It was at the same conversation. Mr. Pearce was upset with that letter and he did say that Mr. Kilmartin was not to get this money back and that he had quit Mr. Kilmartin. I was taken by surprise because all I knew up until then that he had been fired; that's what I had been told. And I said to him, 'What do you mean that you quit? I thought you have been fired?' And he said something to the fact that he would never let Kilmartin fire him. He'd quit before he had to do that."

The trial justice inferred that Kilmartin fired plaintiff and the two then worked out a "gentlemenly [*sic*] arrangement, whereby Pearce resigned voluntarily and got some severance pay and everybody left saving face." Finally, the trial justice identified particular inconsistencies that he found to weaken the testimony presented by plaintiff and Kilmartin.

We cannot agree with plaintiff's contention that the trial justice's inference was not based on any competent evidence in the record. Nor do we find that *Massemini v. Peterson*, 72 R.I. 213, 49 A.2d 758 (1946), supports plaintiff's claim. As in this case, the central issue in *Massemini* was whether the plaintiff was fired by the defendant or resigned voluntarily. There the trial justice granted a new trial after drawing an inference from the evidence "to the effect that the defendant was seeking an excuse or opportunity to discharge the plaintiff, because he was no longer needed since the work for the government was almost completed." *Id.* at 216, 49 A.2d at 759. Upon review of the evidence this court held that this crucial inference conflicted with uncontradicted testimony. Furthermore, the trial justice in *Massemini* failed to explain why he found certain witnesses more credible than others. *Id.*

Two important differences emerge that distinguish this case from the factual context of *Massemini*. In *Massemini* the trial justice drew an inference that conflicted with uncontradicted testimony. He also failed to explain why he found the testimony of certain witnesses more credible than others. In the case before us, the trial justice's conclusions were based on conflicting testimony. He also explained why he rejected some testimony and accepted other testimony.

▪ The trial justice, when ruling on a motion for a new trial, must pass on the credibility of witnesses and, in doing so, may reject testimony when it is impeached or contradicted by other positive testimony or by circumstantial evidence or because of inherent improbabilities or contradictions that alone or in connection with other circumstances satisfy the justice of its falsity. *Barbato v. Epstein*, 97 R.I. 191, 193, 196 A.2d 836, 837 (1964).

After sifting through the evidence and determining credibility, the trial justice determined that the jury verdict was contrary to the evidence and was "satisfied that the credible evidence in this case is to the effect that the plaintiff after being fired, voluntarily resigned in order to get some severance pay." For example, Rita Cooney testified that she had typed a letter of resignation for plaintiff although he denied ever seeing or signing such a letter. Constance Roberts testified that plaintiff had told her he "quit Mr. Kilmartin" and that he would never give Kilmartin the pleasure of firing him. Finally, plaintiff received what Kilmartin described as two weeks' severance pay after their meeting. We conclude that the trial justice reasonably inferred from this evidence that plaintiff voluntarily resigned after having been fired by Kilmartin.

The plaintiff also alleges that the trial justice was clearly wrong in substituting his judgment for that of the jury. This court has recognized that

"a trial justice cannot make an independent evaluation without substituting his judgment for that of the jury to some extent. The vital question, however, is whether that substitution of judgment is in accordance with the standards laid

down in our cases." *Bennett v. Bennett,* 433 A.2d 968, 971 (R.I. 1981).

The trial justice in this case carefully followed the established standards for a new trial. He set forth his reasoning in detail. He evaluated the credibility of the witnesses. His conclusions were drawn from conflicting evidence in the record. We conclude that he did not misconceive material evidence, did not overlook material evidence, and was not otherwise clearly wrong.

For the reasons stated, the plaintiff's appeal is denied and dismissed, the judgments appealed from are affirmed, and the papers in the case are remanded to the Superior Court.