Catherine SWERDLICK, et al.

v.

Robert P. KOCH.

No. 96–195–Appeal.

Supreme Court of Rhode Island.

Dec. 7, 1998.

David Oliveira, Providence, for plaintiff.

Michael R. Deluca, Peter Mathieu, Providence, for defendant.

Present: WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

A tabloid headline describing the trial of this case might read as follows: "JUDGE NIXES ZONING OUTLAWS' SUIT AGAINST NOSY NEIGHBOR." The husband-and-wife plaintiffs, Gerald and Catherine Swerdlick (Gerald, Catherine, or plaintiffs), claimed that the defendant Robert

Koch's (Koch or defendant) ongoing surveillance of various alleged business activities occurring outside their Westerly home violated their right to privacy under G.L.1956 § 9-1-28.1. Furthermore, the plaintiffs alleged that the defendant's conduct in reporting such activities to a municipal zoning officer and to the plaintiffs' neighbors tarnished their reputation and caused them to suffer emotional distress. A Superior Court trial justice sitting with a jury heard four days of testimony before she granted the defendant's motion for judgment as a matter of law and dismissed the plaintiffs' claims. For the reasons set forth below, we deny the plaintiffs' appeal and affirm the trial court's judgment in favor of the defendant.

## Facts and Travel

On David Avenue, a dead-end street in the Town of Westerly (town), plaintiffs and defendant lived only a few homes apart from one another in a residential neighborhood. In the early 1980s, Gerald, who was legally blind in one eye and totally blind in the other, began selling visual aids for the blind and visually handicapped. Thereafter, in the mid-1980s, he started a mail-order business from his home called Electronic Visual Aid Specialists (EVAS).[1] Assisted by his wife and several employees, EVAS's sales volume grew as the years passed to the point that plaintiffs began to use their garage for the receiving, warehousing, assembling, and shipping of EVAS products. From September 1989 through December 1989, Gerald received product deliveries from various shipping and delivery services at least once or twice a day for up to five days a week. (The defendant testified that upon his retirement in February 1989, he observed deliveries occurring four times a day at least five days a week.) The defendant initially noticed a tractor-trailer truck at plaintiffs' home in 1987, and thereafter, the regular coming and going of the delivery trucks and automobiles steadily increased.

To document that plaintiffs were operating a business out of their home in violation of the town's zoning ordinances, defendant began photographing and logging the apparent business-related activities occurring outside plaintiffs' residence. In the summer of 1989, plaintiffs first encountered defendant standing in the street at the end of their driveway taking photographs. When plaintiffs approached defendant, he stated, "My name is Robert Koch, and I'm sick and tired of what you're doing here." A few weeks later, Catherine saw defendant looking at vehicles parked in her driveway and taking notes from the street.

By a letter dated October 5, 1989, defendant complained to Jane Barber (Barber), the town's zoning inspector, about plaintiffs' operation of a home-based business in violation of the town's zoning ordinance.[2] In addition, defendant sent Barber photographs of delivery trucks and automobiles he and his neighbors had observed at plaintiffs' residence. In response, Barber placed these items in a public file and contacted plaintiffs to inquire whether they actually were operating a business from their home. Gerald informed Barber that he was running EVAS as a mail-order business out of his home and allowed her to inspect the premises to review this operation. Upon doing so, she noticed a shipping and receiving area in plaintiffs' garage. In addition, she viewed three offices in the upstairs of the house furnished with computers. According to Barber, "[i]t was definitely a business set up" that had "considerable packaging."

She concluded that plaintiffs were operating their business in violation of the town's

---

1. EVAS was not incorporated under its own name. The plaintiffs also had a gift-shop business located at Misquamicut Beach in Westerly, which was incorporated in the name of Jerry's of Misquamicut, Inc. (Jerry's) and had a d/b/a, trade style of EVAS. Jerry's continued operating until the late 1980s when plaintiffs' mail-order business increased.

2. The letter to Jane Barber was signed by defendant and three neighbors, and reads as follows:

"We would like to call to your attention a business operating in a residential R15 area. This business operates with approximately (4) employees and numerous truck deliveries from a house numbered 16 on David Avenue.

"What was a dead end [sic] street now resembles a thoroughfare. Children and pedestrians are at risk with the increased traffic.

"Property values are affected. It is a situation we want to end."

zoning ordinance. She then arranged a November 1, 1989 meeting with plaintiffs and other residents of David Avenue to persuade plaintiffs to abate the violation. At that meeting, Barber informed plaintiffs that their business activities must cease and that EVAS needed to move to a properly zoned location. Participants in the meeting also addressed the concerns raised earlier by defendant, such as the alleged degradation of the neighbors' property values because of plaintiffs' business; the increase in traffic on David Avenue; and the steady increase of commercial activity on the street over the previous several years. The plaintiffs did not deny that before January 1, 1990, they had been operating a warehousing, shipping, and receiving business out of their home in violation of the town's zoning ordinance. Barber gave plaintiffs sixty days to move—establishing a January 1, 1990 deadline—because their business "was rather extensive." She allowed plaintiffs, however, to maintain an office at their home.

After the November 1st meeting, defendant sent Barber a letter dated November 3, 1989 to further support his complaint.[3] In this letter, he listed the license-plate numbers of ten vehicles that he had observed at plaintiffs' house. The defendant assumed that most of the vehicles he had seen there were business-related due to the frequency and nature of their arrivals and departures. He did not know for certain, however, to whom the vehicles belonged, or why they were at plaintiffs' residence. The evidence

established that some of the automobiles did in fact belong to EVAS employees, but that several of the vehicles were present for non-business reasons.[4]

Meanwhile, after their meeting with the zoning inspector, plaintiffs immediately began looking for commercial space. Eventually, on December 30 and 31, 1989, they moved the shipping, receiving, and warehousing operations for their business to a commercially zoned location. Between December 1, 1989 and January 1, 1990, Barber performed three or four drive-by inspections of plaintiffs' house lasting approximately five minutes a piece.[5] Barber also inspected EVAS's new commercial location. Although Barber did not document her inspections in the zoning official's file, at no time did Barber observe delivery trucks arrive at plaintiffs' house. Per Barber's erstwhile request, Gerald sent her a letter dated January 4, 1990 stating that he had moved these activities from his home to a different location.[6]

Upon receipt of Gerald's January 4th letter, Barber submitted a report to the town manager in which she wrote, "[t]he violation existing at 16 David Ave., has been abated to the degree that the receiving and shipping operation of the mailorder [sic] company has rel[ ]ocated to a business zoned area." Nevertheless, on January 10, 1990, defendant and several neighbors wrote another letter to Barber complaining that plaintiffs had not yet ceased operating their business out of their home.[7] The defendant asserted that he

3. The letter states:

"At a meeting in the Town Hall last Wednesday, I submitted additional pictures of the business activities on David Avenue, taken October 27, 1989. I neglected to give the vehicle registration number as I have previously. That list follows: * * *. Registration 17351 is the UPS truck. Many of the other plate numbers are also listed with my previous pictures and obviously [are] employees. Talk about traffic!"

4. For example, a visiting nurse parked at plaintiffs' home daily while caring for Gerald's father, who was recuperating from an operation at their home. During his recuperation, Gerald's father also kept an automobile at the house. Catherine testified that she volunteered with the Girl Scouts of Rhode Island, and that several people would visit with her at her home in connection with Girl Scout activities.

5. Barber described the inspections as "cursory." She stated: "I didn't stop and park there, just drove by the [sic] house. Would go down the end of the street, their house is on a dead end [sic] street, would go down, turn around, make a visual inspection, or whatever, and leave. Maybe there five minutes."

6. Gerald testified that the new location required extensive construction work. The renovation was not complete by January 1, 1990, but enough of it had been finished for the business to move in.

7. In pertinent part, the letter stated:

"We are writing again after our Wednesday, January 11th meeting with you to state our position and refute Mr. Swerdlicks [sic] letter.
"The trucks continue to come to Daveid [sic] Avenue most noticeable the U.P.S. truck

continued to witness delivery trucks coming to and going from plaintiffs' residence. Although he could not say for certain, defendant approximated that he observed the daily arrival of three delivery vans that seemingly followed the same frequency and pattern as the delivery vans that had arrived at plaintiffs' home before January 1, 1990.

Gerald admitted that vans did in fact arrive occasionally at his home after December 31, 1989 to deliver business products. He stated, however, that after 1989 he never ordered the delivery of EVAS products to his home and that these shipments came there by mistake. Indeed, plaintiffs claimed that after 1989 they would not permit trucks to unload business products at their house and would have the shipments rerouted to their new commercial location. However, Catherine acknowledged at trial that delivery trucks still would come to her house on a regular basis but only to turn around and proceed elsewhere.[8]

In response to defendant's January 10th letter, Barber inspected plaintiffs' new place of business and found no violation. Nonetheless, as of March 1990, defendant testified that he continued to observe business-like activities occurring outside plaintiffs' house. These observations spurred him to take more photographs and to keep a log of these

activities for submission to Barber (though Barber never asked defendant to do so) to further support his complaint about the apparent business activities there. Despite these observations, defendant took no photographs from January 8, 1990 through March 20, 1990. But on April 3, 1990 and thereafter, on the advice of an attorney they had consulted in the meantime, defendant and several neighbors kept a record of events occurring at plaintiffs' home. The entries consisted of their observations of automobiles, delivery trucks, and employees coming from and going to plaintiffs' home on a daily basis, as well as a listing of automobile registration numbers and descriptions of persons entering plaintiffs' home.

As a result of defendant's continued and numerous complaints, Barber conducted another inspection of plaintiffs' home and their new business location on April 6, 1990. In a memorandum dated April 9, 1990,[9] Barber concluded that plaintiffs had abated the zoning violation at their residence. With respect to the commercial location, Barber noted that it housed four employees, with shipping, receiving, and mail-order operations on two floors. She also observed a second office in the midst of construction and described the scene there as "intense."

---

[8] At trial, Catherine testified: "Trucks, cars would come down the street to our driveway, pull in, back out, go back down the street." The

which arrives three (3) times per day. Mr. Swerdlicks [sic] employees continue to come to David Avenue as many as six (6) of their cars line our street.

"Customers/salespeople continue to come to David Avenue at all hours of the day and night.

"We have never agreed to having a business office in this residential area. We want this business-shipping, receiving, warehousing, office and any other functions removed from this street. We want this to occur soon and suggest February 15, 1990, one month from now as the latest possible date. We think that is appropriate since the two (2) month moving time we agreed in November has been violated.

"As we left your office we went to the Town Tax Assessors Office and found out that no tax has been paid on that business since it began. It seems as though Mr. Swerdlick has also been devious with the town for four or five years."

The zoning inspector set February 15th as another deadline.

plaintiffs' home was on the left-hand side near the end of David Avenue. There was only one residence located on that side of the street beyond their home.

[9] Her zoning report states, in pertinent part:

"Made an interior inspection of 16 David Street [sic], 9:30 A.M. Friday, April 6, 1990. Found no longer storage, receiving and shipping. Office space was decreased. A personal office for Mr. Swerdlick with special visual aids (he's legally blind) and a computer room which is used by the family, and is tied in with his business computer.

"Made an interior inspection of new premises located in a business zone * * *. There is approximately 2000 square feet of space, housing shipping, receiving and mail order [sic] operations on two floors. There were four (4) employees on the premises at the time. UPS made a delivery while I was there.

" * * * I find that the business, [EVAS] has been relocated in an appropriate site, and that a violation no longer exists at 16 David Avenue. I consider the solution to be timely and cooperative."

At a May 2, 1990 meeting of the town zoning board, defendant reiterated his concerns that the zoning violation had not been abated, that plaintiffs were still using their home for business, and that the commercial traffic on David Avenue was still a hazard. Barber stated, however, that whenever she occasionally would drive up and down David Avenue from January 1990 through May 1990, she did not notice any violation. Still dissatisfied, defendant made further complaints to the zoning inspector through his attorney. Consequently, Barber again inspected plaintiffs' home and business location. Once more she found no violation, as the only potential business activity Barber observed was an office with a computer. In contrast, at plaintiffs' new place of business, Barber noted a "full fleged [sic] mail order [sic] catalog, shipping, receiving operation." Near the end of 1990, defendant's attorney asked Barber to perform another inspection of plaintiffs' residence, but Barber refused.

The defendant continued to take pictures and log activities outside plaintiffs' house until May 9, 1990. Occasionally, defendant even would photograph these activities with a telephoto lens to obtain better pictures. Nevertheless, he did not photograph or record activities that were not visible to the public from the street in front of their home. The plaintiffs acknowledged that defendant's photographs of the delivery trucks accurately represented activities occurring outside of their home that were visible to their neighbors. Gerald claimed, however, that some of the pictures were incorrectly labeled as showing six employees' cars and as representing salesmen and customers entering his house. He conceded, however, that at least some of the vehicles in the pictures belonged to EVAS employees who still came to his house regularly. Moreover, Gerald admitted that to his knowledge defendant never set foot onto his property. The defendant took all photographs admitted as evidence from surrounding locations, including his own yard.

In May of 1990, plaintiffs tried to put an end to defendant's surveillance by contacting the Westerly Police Department. On two different occasions in May, a police officer informed defendant that his conduct was upsetting plaintiffs. By this time, Catherine claimed that she was experiencing distress and suffering from various physical and emotional ailments caused by the stress of being repeatedly photographed and watched. Her doctor testified that she suffered from stress-induced irritable-bowel syndrome.

After four days of testimony before a jury in November 1995, the trial justice granted defendant's motion for judgment as a matter of law on all counts in plaintiffs' complaint after plaintiffs rested their case. The plaintiffs appeal from the dismissal judgment that entered following this ruling.

## Standard of Review

■■■■ "The standard for granting a motion for judgment as a matter of law is the same as that applicable to its precursor, a motion for a directed verdict." *Mellor v. O'Connor*, 712 A.2d 375, 377 (R.I.1998). The trial justice, and this Court on review, should consider the evidence presented at trial in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses, and should draw all reasonable inferences from the evidence to support the position of the nonmoving party. *See Simmons v. Lincoln Electric Co.*, 696 A.2d 273, 274 (R.I.1997); *DeChristofaro v. Machala*, 685 A.2d 258, 262 (R.I.1996). If, after review, factual issues remain upon which reasonable minds could differ, then the trial justice should submit the issues to the jury for determination and deny the motion for judgment as a matter of law. *See Simmons*, 696 A.2d at 274; *DeChristofaro*, 685 A.2d at 262. If, on the other hand, no relevant issues of fact exist and defendant is entitled to judgment as a matter of law, then the trial justice should grant the motion and dismiss the complaint.

## Analysis

### I. The Invasion–of–Privacy Claims

#### A. Intrusion

The plaintiffs argue that the trial justice erred in granting judgment as a matter of law on their invasion-of-privacy claims. They claim that defendant's conduct violated

three of their four rights to privacy protected under G.L.1956 § 9–1–28.1.[10] First, plaintiffs allege that, by repeatedly photographing activity occurring outside of their residence; by maintaining a log of the dates, times, and license-plate numbers of arriving delivery trucks, employees, and other vehicles; and by repeatedly requesting town inspections for alleged zoning violations, defendant violated plaintiffs' right under § 9–1–28.1(a)(1) to be secure from unreasonable intrusions upon their physical solitude or seclusion. Liability under this statutory provision exists in the event of an "invasion of something that is entitled to be private or would be expected to be private; [and][t]he invasion was or is offensive or objectionable to a reasonable man." Section 9–1–28.1(a)(1)(i)(A)(B). Furthermore, the person responsible for such an invasion need not benefit from the disclosure of whatever information he or she obtains as a result of the invasion. *See* § 9–1–28.1(a)(1)(ii).

■ We agree with the trial justice that the evidence in support of this claim was insufficient as a matter of law to establish a privacy violation. When examining the language of a statute that is clear and unambiguous, "this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *Accent Store Design, Inc. v. Marathon House, Inc.*, 674 A.2d 1223, 1226 (R.I.1996). This aspect of the privacy statute only protects against an invasion of "one's physical solitude or seclusion," neither of which is present when one ventures outside his or her house into public view. The conduct and activity at issue here does not fit within the language of the privacy statute because it all occurred in full public view, albeit it happened in the vicinity of plaintiffs' residence.[11]

At trial, plaintiffs failed to present any evidence that would suggest that defendant's actions intruded upon their private affairs. On the contrary, the evidence showed that defendant took photographs and recorded events that were taking place outside of plaintiffs' house, all of which were in full view of their neighbors and of any other member of the public who may have been present. Indeed, plaintiffs acknowledged as much. They conceded that the photographs and other records submitted by defendant to the zoning inspector for inclusion in a public file accurately reflected conduct visible to anyone who may have happened to pass by their house. Moreover, defendant neither entered plaintiffs' property nor photographed or recorded an event that was not plainly visible to other neighbors living on David Avenue.

■ The plaintiffs were not entitled, nor could they reasonably have expected, to maintain privacy with respect to those activities taking place outside of their residence in a location visible to any passersby. *See Wehling v. Columbia Broadcasting System*, 721 F.2d 506, 509 (5th Cir.1983) (affirming the dismissal of an invasion-of-privacy claim based on a broadcast of the plaintiff's fraudulent activities because the report showed nothing more than what was visible from a public street); *Jaubert v. Crowley Post–Signal, Inc.*, 375 So.2d 1386, 1390–91 (La.1979) (holding that there was no physical intrusion

---

**10.** Rhode Island's privacy statute, G.L.1956 § 9–1–28.1(a) protects the following four rights:

"(1) The right to be secure from unreasonable intrusion upon one's physical solitude or seclusion;

\* \* \*

"(2) The right to be secure from an appropriation of one's name or likeness;

\* \* \*

"(3) The right to be secure from unreasonable publicity given to one's private life;

\* \* \*

"(4) The right to be secure from publicity that reasonably places another in a false light before the public \* \* \*."

**11.** The Restatement (Second) *Torts*, § 652B cmt. c, at 379–80 (1977), offers insightful commentary on this point:

"[A] defendant is subject to liability [for intrusion upon seclusion] only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs. Thus there is no liability for the examination of a public record concerning the plaintiff, or of documents that the plaintiff is required to keep and make available for public inspection. Nor is there liability for observing him or even taking his photograph while he is walking on the public highway, since he is not then in seclusion, and his appearance is public and open to the public eye."

upon the plaintiffs' seclusion when an individual takes a photograph of an object that any member of the public is free to observe); *McLain v. Boise Cascade Corp.*, 271 Or. 549, 533 P.2d 343, 346 (Or.1975) (concluding that no invasion of privacy occurred where the defendant filmed activities that neighbors or others on the road abutting the front of the property could have observed). Here, plaintiffs were conducting a mail-order business out of their home in a residential location. Much of this activity was, by its nature, visible to the public, and plaintiffs had no reasonable expectation of privacy with respect to such conduct.

■ The plaintiffs argue, however, that a home should be a place of sanctuary and of physical seclusion, and that the privacy statute should protect events occurring in and around their home regardless of whether they occur in private or in public. They therefore argue that defendant's conduct invaded the sanctity of their home. Additionally, plaintiffs claim that the several zoning inspections of their home at defendant's request similarly invaded their privacy. We disagree. Activities occurring in plain view of the public are not entitled to the protection of the privacy statute merely because they occur on private property in the vicinity of the actor's home. *See Wehling*, 721 F.2d 506; *Jaubert*, 375 So.2d 1386; *McLain*, 271 Or. 549, 533 P.2d 343. Here, the zoning official had a legitimate reason to inspect plaintiffs' home because they had been and were alleged to be still violating the zoning ordinance. Furthermore, plaintiffs permitted the zoning official to enter their house to conduct an inspection on more than one occasion. Hence, they should not be heard to complain that defendant's conduct invaded an area of physical seclusion or solitude that plaintiffs were entitled to keep private.

■ In addition, plaintiffs also assert that the right to be free from intrusion upon one's physical solitude or seclusion is violated if one's mental well-being is intruded upon, and that defendant's relentless behavior in recording and reporting plaintiffs' daily activities for substantial periods invaded the sanctity of their minds. This contention also lacks merit under the circumstances of this case. To establish a claim under this section of the privacy statute, some invasion of a person's physical solitude or seclusion must have occurred, and this Court will not rewrite the statute contrary to its plain meaning to cover alleged psychological invasions caused by mere observations of public activity that do not also involve the requisite physical invasion mandated by the statute. Here, no physical intrusion upon any private sanctuary occurred, nor did defendant personally harass plaintiffs whenever they appeared in public. Thus, defendant has not violated the statute, notwithstanding the fact that his conduct may have been, at times, offensive to plaintiffs.

## B. Publication of Private Facts

The plaintiffs next claim that defendant's photographing and maintaining a log that included at least some non-business activities taking place outside of their home unreasonably publicized their private life in violation of § 9–1–28.1(a)(3)—particularly after they allegedly abated the zoning violation. To recover for a violation of this right, plaintiffs must prove the "publication of a private fact; [and that] [t]he fact which has been made public must be one which would be offensive or objectionable to a reasonable man of ordinary sensibilities." Section 9–1–28.1(a)(3)(i)(A)(B). The disclosed information need not benefit the discloser. *See* § 9–1–28.1(a)(3)(ii).

■ In examining what constitutes a "private fact," this Court has determined that "[the] plaintiffs must demonstrate that they actually expected a disclosed fact to remain private, and that society would recognize this expectation of privacy as reasonable and be willing to respect it." *Pontbriand v. Sundlun*, 699 A.2d 856, 865 (R.I.1997). Such a privacy claim must be "bona fide and of a type that a reasonable person would expect to be observed." *Id.; see also Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576, 587–88 (1967) (Harlan, J., concurring) (defining "reasonable expectation of privacy" within the context of the Fourth Amendment). Applying these standards to the case at bar, we agree with the trial justice that plaintiffs did not prove that

defendant published any *private* facts about them in violation of their right to privacy.

The complained of activity—defendant's photographing and recording of the arrival and departure times of delivery trucks, his cataloging of vehicle registration numbers, and his describing those persons he observed at plaintiffs' home, all of which at one time or another related to plaintiffs' ongoing business activities—were not "private facts." Indeed, the town kept the collected information, which was submitted to the zoning board, in a public file as documentation of plaintiffs' alleged zoning violation. In so doing, defendant and his neighbors did not publish any private facts.

Here again, we advert to the Restatement (Second) *Torts,* § 652D cmts. *b* & *c:*

"*b. Private life.* * * * There is no liability [for publication of private facts] when the defendant merely gives further publicity to information about the plaintiff that is already public.

"Similarly, *there is no liability for giving further publicity to what the plaintiff himself leaves open to the public eye.* Thus he normally cannot complain when his photograph is taken while he is walking down the public street and is published in the defendant's newspaper. Nor is his privacy invaded when the defendant gives publicity to a business or activity in which the plaintiff is engaged in dealing with the public." Restatement (Second) *Torts,* § 652D cmt. *b,* at 385–86 (Emphasis added.)

"*c. Highly offensive publicity.* * * * Complete privacy does not exist in this world except in a desert, and anyone who is not a hermit must expect and endure the ordinary incidents of the community life of which he is a part. Thus, *he must expect the more or less casual observation of his neighbors as to what he does, and that his comings and goings and his ordinary daily activities, will be described in the press*

*as a matter of casual interest to others."* *Id.* cmt. *c,* at 387 (Emphasis added.)

Although defendant's detailed observations of plaintiffs' activity were decidedly on the "less casual" end of the scale, the facts disclosed by the photographs and recorded entries related to vehicles and persons present outside plaintiffs' residence that were openly visible to anyone passing by or to any neighbors living on plaintiffs' street. Thus, it is immaterial whether defendant knew to whom the vehicles belonged or for what specific purpose they were at plaintiffs' home. The defendant informed zoning officials of what he, other neighbors, and any member of the public could have witnessed from the street and from other areas near plaintiffs' home. Moreover, given the repeated coming and going of delivery trucks and other large vehicles, it was reasonable for defendant to assume that plaintiffs were continuing their home-based business activities even after plaintiffs supposedly moved their business. The defendant, in publishing these already public facts to the zoning inspector and to his neighbors, sought to reveal the extent of plaintiffs' business activities to establish their violation of the zoning ordinance. Thus, defendant's actions in observing and publishing what was a legitimate public concern did not result in any invasion of plaintiffs' protected privacy rights. *See Pontbriand,* 699 A.2d at 864 (citing § 652D of the Restatement (Second) *Torts* in its interpretation of § 9–1–28.1(a)(3)).[12]

## C. Defamation & False Light

■■■■■ We next address plaintiffs' defamation and false-light claims together because the applicable law is similar. It is well-settled that the court shall decide whether a statement contains a defamatory meaning. *See Healey v. New England Newspapers, Inc.,* 520 A.2d 147, 150 (R.I. 1987). A defamation action requires a plaintiff to prove " '(a) a false and defamatory statement concerning another; (b) an unpriv-

---

12. Section 652D of the Restatement (Second) *Torts* states:

"One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that

(a) would be highly offensive to a reasonable person, and

(b) is not of legitimate concern to the public."

ileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher;' and (d) damages, unless the statement is actionable irrespective of special harm." *Healey v. New England Newspapers, Inc.*, 555 A.2d 321, 324 (R.I.1989) (quoting *Lyons v. Rhode Island Public Employees Council 94*, 516 A.2d 1339, 1342 (R.I.1986) (quoting Restatement (Second) *Torts*, § 558, at 155 (1977))).

 As to the first element, "[a]ny words, if false and malicious, imputing conduct which injuriously affects a [person's] reputation, or which tends to degrade him [or her] in society or bring him [or her] into public hatred and contempt, are in their nature defamatory ." *Elias v. Youngken*, 493 A.2d 158, 161 (R.I.1985) (quoting *Reid v. Providence Journal Co.*, 20 R.I. 120, 124–25, 37 A. 637, 638 (1897)). Furthermore, the court must examine the alleged defamatory words in the context of the publication in which they appear as a whole, *see Lyons*, 516 A.2d at 1343; *Bray v. Providence Journal Co.*, 101 R.I. 111, 116–17, 220 A.2d 531, 534–35 (1966), and give the words their plain and ordinary meaning in the community in which they are published, *see Lyons*, 516 A.2d at 1343; *Reid* 20 R.I. at 122, 37 A. at 637–38. The decisive inquiry, however, "is what the person * * * to whom the communication was published reasonably understood as the meaning intended to be expressed." *Lyons*, 516 A.2d at 1343 (quoting Restatement (Second) *Torts*, § 563 cmt. *e*, at 164 (1977)).

 The trial justice divided the alleged defamatory statements into two categories.

The first category consisted of written and oral statements, referenced in defendant's January 10, 1990 letter to Jane Barber, that suggested plaintiffs were continuing their business activities at their home in violation of their abatement agreement. Before January of 1990, defendant's truthful statements concerning plaintiffs' business activities caused the zoning authorities to require plaintiffs to relocate their business to a commercial location by the end of December 1989. After this deadline, however, defendant and his neighbors continued to observe delivery trucks and employees' cars arrive at plaintiffs' residence. Notwithstanding defendant's incorrect assumption that plaintiffs had failed to move at least the shipping and delivery aspects of their business out of their home, defendant based his statements to the zoning inspector on his personal observations and those of his neighbors. While some of defendant's accounts of plaintiffs' business activities may have been exaggerated or slightly off the mark factually, these statements were substantially true and thus not defamatory. *See Healey*, 555 A.2d at 325 (stating that as long as the "gist or the sting of the publication is true, the publication is not false"); *Steere v. Cupp*, 226 Kan. 566, 602 P.2d 1267 (Kan.1979) (holding that no liability attaches for published statements that are substantially true); Restatement (Second) *Torts*, § 581A cmt. *f*, at 237 (noting that "[s]light inaccuracies of expression are immaterial provided that the defamatory charge is true in substance"). We discern no error in the trial justice's reasoning that these statements were not defamatory.[13]

13. The trial justice found:
"Defendant's statements after January 1st of 1990, although arguably exaggerated, were an attempt to document these observations and bring them to the attention of the zoning inspector and other town officials. In fact, subsequent municipal action in the way of zoning inspections was taken. While plaintiffs can fairly quarrel with the exaggerated nature of the statements, their own testimony reveals that they cannot quarrel with their essential underlying truth: indeed throughout the first half of 1990 UPS and RPS trucks continued to come to 16 David Avenue (albeit not three times per day), employees continued to work at their residence during that time period (albeit at most two others in addition to plaintiffs themselves and not six employees), plaintiffs ultimately, by the summer of 1990, had fewer business functions occurring at 16 David Avenue than they did as of the first of the year, and plaintiffs had in fact moved themselves completely to their new business location and their employees no longer came to the residence. The town zoning inspector or other town officials reading the January 10, 1990, letter or hearing other similar statements about alleged ongoing business activity at plaintiff's [*sic*] residence, would have read it or viewed those statements as a claim by defendant and others of ongoing business activities at plaintiffs' home warranting further investigation. (*See Lyons [v. Rhode Island Public Employees Council 94*, 516 A.2d 1339, 1343 (R.I.1986) ]*). It would have been accurate to read the statements that way, they indeed were accurate (though overstated) if read that way and indeed

■ The second category of alleged defamatory remarks concerns plaintiffs' alleged nonpayment of local business taxes referenced to in defendant's same letter of January 10, 1990. The defendant went to the Tax Assessor's office to inquire as to whether plaintiffs paid local business taxes for EVAS. According to the tax official, no record of any such tax payments could be found. The plaintiffs argue that defendant's statements were false and that his nonpayment-of-taxes assertion negatively affected plaintiffs' credibility so that the zoning inspector and others in the community were less willing to believe they had complied with zoning ordinances.[14] According to Gerald, EVAS incorporated as Jerry's of Misquamicut, Inc. (Jerry's), d/b/a EVAS, and he paid whatever local taxes EVAS owed in the name of Jerry's. Catherine also testified that they paid taxes on their business. The plaintiffs, however, did not produce any documentation or other corroboration that such taxes were in fact paid by Jerry's for EVAS. Therefore, the trial justice was entitled to conclude that plaintiffs failed to introduce sufficient credible evidence concerning the alleged falsity of defendant's statements merely by asserting that they had paid the taxes in question under a different name.

■ But even if the statements at issue had been shown to be false and defamatory, defendant still could not be held liable for such statements absent proof that plaintiffs had sustained some special damages as a result of their publication. No such proof was presented. Although plaintiffs argue that the trial court erred in finding that none of the statements at issue were defamatory per se, thereby obviating any need for a special-damages showing, this Court has held that for statements to qualify as libel per se,

the "publication [must] impute[ ] insolvency, financial embarrassment, unworthiness of credit, or failure in business to a plaintiff, * * * [b]ut to make them so * * * it is essential that such imputation relate to or affect the plaintiff in his business." *Andoscia v. Coady*, 99 R.I. 731, 736, 210 A.2d 581, 584 (1965). The defendant's statements concerning plaintiffs' alleged nonpayment of taxes did not fall into any of these categories. Moreover, the evidence presented at trial established that defendant's statements did not, in any way, affect or relate to plaintiffs' business nor did any proof exist that anyone with whom plaintiffs did business knew of these statements. Accordingly, absent any such proof of damages or libel per se, the trial justice properly granted defendant's motion for judgment as a matter of law on this claim.

■ Next, plaintiffs assert that defendant's inaccurate and exaggerated descriptions of various business activities placed them in a false light before the public in violation of § 9–1–28.1(a)(4). To recover under this section, plaintiffs must establish that "[t]here has been some publication of a false or fictitious fact which implies an association which does not exist; [and][t]he association which has been published or implied would be objectionable to the ordinary reasonable man under the circumstances ." Section 9–1–28.1(a)(4)(i)(A)(B). Unlike defamation, a false-light action requires that a plaintiff be "given unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false, and so is placed before the public in a false position." Restatement (Second) *Torts*, § 652E cmt. *b*, at 395. Further, a plaintiff states a cause of action for invasion of privacy when "there is such a major misrepresentation of

further inspections were found to be warranted and the activity of which defendants [*sic*] complained further abated."

14. When asked at the trial whether Barber thought less of Mr. Swerdlick, she replied:
"It's not that I thought less of them, but I was curious how someone could do that. * * * "Most people, I think, that have a substantial business they pay their taxes, and after, it was just a passing question in my mind as to why this was not so. * * *"

In response to a question concerning whether plaintiffs' alleged nonpayment of taxes caused her to wonder if the zoning violation had in fact been abated, she responded, "[t]hat passed through my mind, yes." The plaintiffs also questioned Nancy Capalbo, the woman who typed the January 10th letter, as to whether she thought less of Mr. Swerdlick after reading the letter. She stated, "I guess so."

his character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in his position." *Id.* cmt. *c,* at 396.

The plaintiffs argue that remarks in several of defendant's letters and statements to the zoning official and zoning board[15] portrayed them in a false light by: (1) asserting that four or more employees were involved in the business (when in fact the evidence established that plaintiffs had less than four employees); (2) describing plaintiffs' residential, dead-end street as a "thoroughfare;" (3) stating that children and pedestrians were at risk due to increased traffic; (4) noting that property values had been adversely affected; (5) misrepresenting vehicles present at plaintiffs' house as business-related and belonging to employees; (6) concluding falsely that business activities, such as shipping, receiving, and warehousing, were ongoing at plaintiffs' house after they abated the zoning violation; (7) misrepresenting that defendant and neighbors saw delivery trucks at plaintiffs' residence three times per day; (8) stating falsely that customers and salespeople were present at plaintiffs' home "at all hours of the day and night;" (9) claiming that plaintiffs failed to pay local taxes for EVAS and characterizing Gerald as "devious;" and (10) commenting at a zoning-board hearing on May 2, 1990 that trucks still made deliveries; that employees, salesmen, and customers continued to come to plaintiffs' home; that a delivery truck backed over a neighbor's driveway and cracked it; that plaintiffs' house was a business rather than a residence; and that the traffic there created a hazard.

**15.** At issue are the letters dated October 5, 1989; November 3, 1989; and January 10, 1990; and oral disclosures made at a zoning-board meeting on May 2, 1990.

**16.** In rejecting plaintiffs' false-light claim, the trial justice based her decision on the same reasons she cited for dismissing the defamation claim and on Restatement (Second) *Torts,* § 652E cmt. *e,* which states:

"When the false publicity is also defamatory so that either action can be maintained by the plaintiff, it is arguable that limitations of long standing that have been found desirable for the

▇▇ Upon examination of these statements in the context in which they were made, we agree with the trial justice's conclusion that plaintiffs failed to prove that defendant published false or fictitious facts as to the appearance of ongoing business activities at plaintiffs' residence.[16] As we expressed earlier, defendant's statements, while sometimes overstated or slightly off the mark in one factual detail or another, nonetheless were based on substantially true facts, and thus cannot be relied upon to support an action for false light. Viewed as a whole, they were not capable of creating false public impressions concerning the type of activity that was taking place at plaintiffs' home. Accordingly, we affirm the trial court's decision to grant judgment as a matter of law as to the false-light claim.

## II. Intentional & Negligent Infliction of Emotional Distress

▇▇ Catherine complains that defendant's actions also amounted to intentional and/or negligent infliction of emotional distress. We previously have recognized a cause of action for the intentional infliction of emotional distress, and in doing so, we adopted the standard set forth in § 46 of the Restatement (Second) *Torts.*[17] *See Champlin v. Washington Trust Co. of Westerly,* 478 A.2d 985, 988–89 (R.I.1984). To impose liability upon defendant based upon this cause of action, "(1) the conduct must be intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question must be severe." *Id.* at 989. In addition,

action of defamation should not be successfully evaded by proceeding upon a different theory of later origin, in the development of which the attention of the courts has not been directed to the limitations ." *Id.; see also Fudge v. Penthouse International, Ltd.,* 840 F.2d 1012, 1019 (1st Cir.1988).

**17.** Section 46 provides:

"(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Restatement (Second) *Torts,* § 46, at 71.

this Court has required at least some proof of medically established physical symptomatology for both intentional and negligent infliction of mental distress. *See Vallinoto v. DiSandro*, 688 A.2d 830, 838–40 (R.I.1997); *Clift v. Narragansett Television L.P.*, 688 A.2d 805, 813 (R.I.1996); *Reilly v. United States*, 547 A.2d 894, 896 (R.I.1988).

█ With regard to the first and second elements of this claim, comment *d* to § 46 of the Restatement provides:

"It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. *Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.* Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " Restatement (Second) *Torts*, § 46 cmt. *d*, at 73 (Emphasis added.)

Here, while the conduct complained of may have given offense to plaintiffs and to other members of their community, it would be a far stretch for us to characterize it as so extreme and outrageous as to be atrocious and utterly intolerable in a civilized community. The trial justice found that defendant's surveillance was a legitimate attempt to "document an alleged zoning violation" and to "protect his right to be free from what he perceived to be business interference in his neighborhood." We agree. The defendant may not be held liable "when he has done no more than insist on his legal rights in a permissible way, even though such insistence is likely or even certain to annoy, disturb, or inconvenience [plaintiff] or even cause [plaintiff] to suffer some emotional distress." *Champlin*, 478 A.2d at 989; *see also Clift*, 688 A.2d at 813; Restatement (Second)

*Torts*, § 46 cmt. *g*, at 76. The defendant's persistence in tracking down, recording, and reporting what he deemed to be potential zoning violations after plaintiffs moved portions of their home-based business was not unfounded. As late as May of 1990, defendant and his neighbors continued to observe business-like activities outside of plaintiffs' residence which were inconsistent with plaintiffs' contrary representations, and with the zoning official's determination that the zoning violation had been abated.

As to the third and fourth requirements, Catherine's physician testified that she suffered from irritable-bowel syndrome caused by stress. Catherine claimed that her problems with defendant resulted in her physical and emotional distress. The plaintiffs' evidence showed. However, that defendant did not know that plaintiff was emotionally sensitive or that his picture-taking was upsetting plaintiffs until May of 1990, when a police officer informed him of such. Upon a second notification by a police officer of plaintiffs' concerns, defendant stopped taking photographs and keeping a log of plaintiffs' activities. We therefore agree that plaintiffs failed to demonstrate that defendant intended to cause Catherine emotional distress or acted in reckless disregard of the probability of causing her such harm.

█ We also agree with the trial justice that defendant's actions—repeatedly photographing and maintaining a log of what appeared to him to be ongoing business activities occurring outside of plaintiffs' home—did not rise to a level of conduct that went beyond all possible bounds of decency such that it could be regarded as atrocious and utterly intolerable in a civilized community. Thus, judgment as a matter of law on the intentional-infliction-of-emotional-distress claim was proper.

Alternatively, Catherine urges the Court to recognize her emotional-distress claim under § 312 of the Restatement (Second) *Torts* (1965).[18] This section imposes liability on a party who intentionally causes emotional distress; however, the conduct complained of need not be extreme or outrageous and the emotional distress need not to be severe.

18. Section 312 reads:

"If the actor intentionally and unreasonably subjects another to emotional distress which

*See Champlin,* 478 A.2d at 987. This Court has yet to recognize a cause of action for intentional infliction of emotional distress under this section, and we decline to do so now under the facts and circumstances of this case.

In *Champlin,* we rejected the application of § 312 and required the higher threshold of § 46 "in debt-collection cases because of the belief that when a creditor or his agent is privileged to use a number of tactics to collect a debt, even though those tactics may cause the debtor to suffer emotional distress, the creditor should be held accountable only if those tactics are extreme and outrageous." *Id.* at 989. Similar reasoning should apply here because members of a residential community also should be privileged to use a number of reasonable tactics to detect, substantiate, and report a zoning violation to the proper authorities. Moreover, even if we were to embrace a § 312 cause of action, we would construe it to require extreme and outrageous conduct (consistent with § 46). Hence, plaintiffs' claim under § 312 would still fail under the facts of this case.

The plaintiffs' final contention is that the trial justice erred in granting judgment as a matter of law on plaintiffs' claim of negligent infliction of emotional distress under § 313 of the Restatement (Second) *Torts.*[19] We have recognized this cause of action in Rhode Island in limited circumstances where the plaintiff is either in the zone of physical danger, or is a bystander to a tragic incident involving someone with whom he or she is closely related, and the plaintiff suffers serious emotional harm accompanied by some physical manifestations of his or her distress

as a result of the defendant's negligence. *See Marchetti v. Parsons,* 638 A.2d 1047, 1052 (R.I.1994); *D'Ambra v. United States,* 114 R.I. 643, 657–58, 338 A.2d 524, 531 (1975).

In granting defendant's motion, the trial justice stated:

"Even under a duty analysis of *Banks v. Bowens [Bowen's] Landing,* [522 A.2d 1222, 1225–27 (R.I.1987),] the requirement of extreme and outrageous conduct seems to be necessary to find foreseeability of harm to plaintiff and a close connection between the conduct and injury so as not to unduly burden a defendant or the community while protecting plaintiffs from harm. Under that reasoning, therefore, this Court finds no duty to exist and no cause of action to exist under section 313 of the Restatement * * *."

We agree. In these circumstances, we are simply unwilling to impose liability upon a defendant for infliction of emotional distress absent proof of extreme and outrageous conduct. *See Reilly,* 547 A.2d at 898. In viewing the evidence in the light most favorable to the plaintiffs, we discern no error in the trial justice's ruling on this claim. Thus, the judgment as a matter of law in favor of the defendant was appropriate.

### Conclusion

For the reasons set out above, we deny and dismiss the plaintiffs' appeal, and affirm the Superior Court's judgment.

---

he should recognize as likely to result in illness or other bodily harm, he is subject to liability to the other for an illness or other bodily harm of which the distress is a legal cause,

 (a) although the actor has no intention of inflicting such harm, and

 (b) irrespective of whether the act is directed against the other or a third person."
Restatement (Second) *Torts,* § 312, at 110 (1965).

**19.** Section 313 states:

 "(1) If the actor unintentionally causes emotional distress to another, he is subject to liability to the other for resulting illness or bodily harm if the actor

 (a) should have realized that his conduct involved an unreasonable risk of causing the distress, otherwise than by knowledge of the harm or peril of a third person, and

 (b) from facts known to him should have realized that the distress, if it were caused, might result in illness or bodily harm.

 (2) The rule stated in subsection (1) has no application to illness or bodily harm of another which is caused by emotional distress arising solely from harm or peril to a third person, unless the negligence of the actor has otherwise created an unreasonable risk of bodily harm to the other."
Restatement (Second) *Torts,* § 313, at 113 (1965).